F. McINTOSH *v.* MERCHANTS' AND PLANTERS' INSURANCE COMPANY.
J. CULBERTSON, Receiver, *v.* W. L. CUSHING, opponent and appellant. *

The Merchants' and Planters' Insurance Company, (established under the provisions of the Act of 1848, for the organization of corporations in this State,) having become insolvent, was, by judgment of court, put into liquidation under a receiver. Among its assets were a number of notes drawn by sundry persons; the following is the purport of one of them: "Twelve months after date, (or sooner if required to meet assessments made by the company,) I promise to pay to the Merchants' and Planters' Insurance Company, or order, five hundred dollars for value received." The receiver brought suit on these notes. *Held :*

1. The unmatured notes stood as security for the performance of any contract which it was lawful for the company to make, and which had been made previous to the expiration of one year from the date of the note.

2d. Although the charter says that the notes are to be given for the security of those who shall insure previous to the formation of the permanent fund—yet where it is also stated the notes are only to be held for a year, and the notes themselves are payable in a year, they must be considered as guarantee notes, liable for debts created before the formation of a permanent fund, and before the maturity of the notes, but not after their maturity.

3. For the expenses of the liquidation, all the guarantee notes are liable *pro rata*. After charging these expenses, *pro rata,* upon all the solvent notes, the residue of the moneys collected upon them respectively, should be treated as distinct funds, applicable by a proper classification to the particular class of claims for which the particular note, according to its date and the date of its maturity, is held responsible. If any of the makers are insolvent, that should not release the solvent makers from liability to the full amount of their notes. Premiums should not be credited on any note, nor any thing but actual cash payment made in fulfilment of the promise contained in the note. A maker who has a lawful claim against the company, should not be allowed to offset it, but only to participate in the dividend upon claims of its class as any other creditor.

The State claimed taxes. The tax on capital was disallowed; the tax on insurance companies was allowed, but without privilege.

One clause of a charter should not be construed in so large a sense as to silence other clauses where, without violence to the language, a construction can be given which will make all harmonize.

The contract of suretyship is not to be extended to any other subject, to any other person, or to any other period of time, than is expressed or necessarily implied in it.

An agreement on the part of the makers of the notes to continue their liability for a longer period than one year from the dates of the notes, must be inferred from the fact, that the notes were found among the papers of the company, when put in liquidation. *Buchanan,* J., dissenting.

From the terms of the charter, the notes constituted the assets—the capital of the company—"for the security of those who should insure previous to the formation of the permanent fund"; and the capital could not be withdrawn previous to the happening of that contingency—the formation of that fund. VOORHIES, J., dissenting.

APPEAL from the Fifth District Court of New Orleans, *Augustin,* J. *Durant & Horner,* for *J. Culbertson,* Receiver, and *W. Christy. J. A. Mabin, E. L. Goold, C. M. Emmerson, E. H. Durell,* and *E. Rawle,* for defendants and appellants.

SLIDELL, C. J. (OGDEN, J., recusing himself.) At first blush, it might seem that the notes which we may call guarantee notes, are applicable only to the satisfaction of claims based upon policies of insurance. But a careful analysis of the 4th section will show, I think, that other liabilities of the company are also protected by them. Not less than five, nor more than ten per cent. was demandable in cash on the day of commencing business, on which day the company could not be liable for losses on policies; and the reasonable inference is, that the money was to go into the general

---

*The cases in which *Pike, Macmurdo, M. White & Co., Meggett, Christy, Harrison, Robbins, Bridge & Brother, Cronan,* and *Dougherty,* were parties, were consolidated and tried with the above.
52

treasury of the company, and was to be used for other wants of the company, as office furniture, books, rent, salaries, &c. Such items would enter into the account of "profits and losses," spoken of in the same section. It must be remembered, that equality is equity; and as there is no express preference given to holders of policies, I think it must be inferred that the object was to protect them with other creditors. I think any person dealing with the company in any matter incidental to its business, whether taking a policy, or leasing it an office, or becoming an employe, or furnishing books or furniture, or making any contract which it was lawful for the company to make, had a right to consider the notes, unmatured at the time of such contract, as standing for his security.

II. I am of opinion, that no maker of a guarantee note is liable to contribute to any loss or liability under a policy of insurance, or other lawful contract made by the company, unless such contract was made previous to the expiration of one year from the date of his note.

This second proposition is not so free from difficulty, but I apprehend it must be adopted upon a survey of all the provisions of the charter pertinent to the subject matter.

From a perusal of the charter, it appears that the company was to start its business, and issue policies, without any cash capital. Hence some other provision was necessary for the protection of persons assured, or otherwise lawfully contracting with the company, in case of losses, and the inadequacy of premiums received to meet them. This provision was made by the guarantee notes.

But it was expected that in time an amount from premiums would be accumulated sufficient to form a capital, and it was supposed that this result would be accomplished partially or wholly, by the first year's business. See section 5th and 21st. At the same time, it was unreasonable to expect parties would be willing to enter into a guarantee for a time entirely uncertain. A term, therefore, for the operation of the guarantee was stipulated, to wit, one year— "the said notes shall be held by the company for the term of one year"—by which I understand that the maker was not to guarantee any policy issued, or contract made, more than a year after the date of his note. Still it might happen that the business of the company might not so prosper, as to realize profits enough to form a fund that would give confidence to customers; and hence the provision for an extension of the guaranty by future consent—"The makers of said notes may, however, agree with the directors, that their notes shall remain in possession of the company for a longer time than one year, upon the same terms as hereinbefore set forth."

This seems to me the only interpretation which will give effect to all the expressions of the charter with reference to which these notes were given, and to the language of the notes themselves. One clause should not certainly be construed in so large a sense, as to silence other clauses, where without violence to the language, a construction can be given, which will make all harmonize. When, therefore, the charter says, the notes are to be given for the security of those who shall insure previous to the formation of the permanent fund, &c., and the same charter says, the notes are only to be held for a year, and the notes themselves are payable in a year, I understand the whole, taken together, as contemplating a contract to this effect: " To the amount of this note, I guarantee the payment of any person effecting insurance in, or other-

wise lawfully dealing with this company, or who has lawfully so dealt, previous to the formation of a permanent fund, and before the expiration of one year from this date."

I look upon these notes, although certainly anomalous in their character, as partaking of the nature of contracts of suretyship ; and the rule is well settled, that such a contract is not to be extended to any other subject, to any other person, or to any other period of time, than is expressed or necessarily included in it.

I do not think the mere fact that the notes remained in the possession of the corporation, can be construed into a new agreement of the nature contemplated in the last clause of section 4th. Let it be observed, that the company necessarily had a right to retain the notes until the class of liabilities they were intended to protect, had been liquidated and ascertained. To any creditor who pretends to have acted on the faith of these notes, it is fair to say, the notes were not ordinary promissory notes, but showed on their face, they were made with reference to the charter, and the charter showed the terms of the makers liability ; you had no right to infer there was a new agreement to extend the term from the mere fact of the retention of possession, without a new agreement endorsed on the notes, or otherwise destinctly shown. I understand the guarantee notes taken in New York by mutual companies, are, in their form, promissory notes, in the legal sense ; that is, a written engagement to pay to another person therein named or his order, or to bearer, absolutely and unconditionally, a certain sum of money at a time specified therein.

A few other points remain for consideration. I think a guarantee note is liable for claims originating before its date, although not for claims originating after its maturity. But for the expenses of the liquidation, all the guarantee notes are liable *pro rata*. After charging these *pro rata* upon all the solvent notes, the residue of the moneys collected upon them respectively, should be treated as distinct funds, applicable by a proper classification to the particular class of claims for which the particular note, according to its date and the date of its maturity, is held responsible. If any of the makers are insolvent, that should not release the solvent from liability to the full amount of their notes. Premiums should not be credited on any note, nor any thing but actual cash payment made in fulfilment of the promise contained in the note. A maker who has a lawful claim against the company, should not be allowed to offset it, but only to participate in the dividends, upon claims of its class, as any other creditor.

We think *Scates* has no right to collect the tax on capital claimed by him for the State, and that the State is a creditor without privilege for the tax on insurance companies and the penalty as claimed.

It is to be regretted that an instrument so important as the charter of a corporation, by which complicated rights and liabilities are to be controlled, should not have been framed with greater accuracy and perspicuity. I admit there is ground for diversity of opinion; but the conclusions I have expressed are those to which my mind has been brought after repeated consideration of this difficult subject.

I refer for further elucidation of the subject, to the opinion prepared by Judge Lea.

Pursuant to the opinion of the majority of the court :

McIntosh
*v.*
Merchants' and
Planters' Ins. Co.

It is therefore decreed, that the judgments in these eleven consolidated causes, be reversed, and that these consolidated causes be remanded as to all the parties, for further proceedings in one suit and *in concurso;* the costs of the appeals to be paid by the receiver and appellee.

Campbell, J. concurring.

Lea, J. (Judge of the Second District Court of New Orleans, sitting in the place of Ogden, J., who recused himself.) Invited, in accordance with the provisions of the Constitution, to serve as a makeweight in the determination of this case, between the equally balanced opinions of the members of this court, I would be content to rest the decision upon the exposition contained in the opinion of Chief Justice Slidell, but as it has been considered by a majority of the court, that, under the circumstances of the case, it would be satisfactory to the parties litigant herein, that I should present a separate statement of the reasons upon which my opinion is based, I have, though it involves a repetition of opinions already expressed, prepared the following memorandum, having reference only to those points upon which there was a division of opinion.

The Merchants and Planters' Insurance Company was established under the provisions of the Act of 1848, for the organization of corporations in this State.

Its act of incorporation was confirmed on the 30th of October, 1849. The objects of the incorporation are set forth in the 2d and 17th Articles of its charter. Having become insolvent, it was put in liquidation on the 28th of January, 1852, and a receiver appointed. Among its assets were discovered certain notes, drawn by sundry persons, in the following form:

NEW ORLEANS, ————, 1849.

Twelve months after date, (or sooner if required to meet assessments made by the company,) I promise to pay to the Merchants and Planters' Insurance Company, or order, ——— dollars, for value received.

　　　　　　Signed,　　　　　　　　　　　　　　　　　A. B.

The receiver has brought suits against the several drawers of these notes, and one of the questions to be determined is, what is the nature and extent of their liability? This is to be ascertained by a comparison of the notes themselves, with the provisions of the charter of the company and the statute in virtue of whose provisions the company was organized.

The Act of 1848, page 75, section 20, provides: " That the amount of the fund subscribed, as the capital wherewith any such company shall commence its business, as well as the manner in which the payment of such fund is secured, if not paid in cash, ——— ——— shall be stated in the act of incorporation." This it appears was not done, but it is urged that the notes sued upon having been furnished in accordance with this provision of the statute, constitute " *the capital*" of the company and, as such, are as much the property of its creditors, as if they had *been* " *paid in cash.*"

For the purpose of the argument, it may be assumed that they do constitute the capital upon which the company transacted business, but if it was provided in the charter, that instead of proceeding to transact business upon a cash capital either paid in, or borrowed, they would go into operation with no greater security than *guarantee notes*, payable in accordance with the provisions of the charter, it does not appear to me that the character of the obligation can be changed, because they constitute its only capital.

The drawers of the notes, in accordance with the charter, furnished to the

company certain conditional obligations; *such as they were*, they constituted the security which creditors looked to in their transactions with the company, and such as they are, they must make the most of them, whether they are or are not the *capital* of the company. For all the purposes for which *they exist as obligations*, they *are* the property of the company.

The question is not to whom do the notes belong? But what is the extent of the liability of which they are the evidence?

It appears to me clear, that the notes do not purport an absolute liability. The liability and the extent of it depends entirely upon the occurrence of losses by the company. If the company loses nothing, the drawers are bound for nothing. If the losses of the company exceed its profits, they promise that they will contribute according to assessment to make good the deficiency. They gain nothing in any event; they do not participate in the profits of the company, (except so far as they may be insurers,) and the only stipulation for their benefit is, that they shall receive six per cent. interest upon their advances or payments, until the same shall be reimbursed.

Now this, it appears to me, is a contract of suretyship. It is the same as if A and B should say to C and others, here is our friend D, who is about entering into business without capital; for the purpose of enabling him to obtain credit, we promise that if the losses in his business during the first year exceed the profits, we will make good the deficiency according to assessment, in a sum not to exceed $1000 each, it being well understood, that upon such payment or advances as we may make, we shall receive six per cent. interest until the same is reimbursed. Now, if this contract were reduced to writing, signed by each of the parties and placed in its possession, this fact could not alter the nature of the obligation, it would still be a contract of suretyship obligatory upon each of the parties according to its tenor.

Nor is the nature of the obligation affected by the fact, that most of the drawers are corporators, since it is not in their capacity as such that the notes are given. This is evident from the fact, that some of the defendants were not parties to the act of incorporation, and it was contemplated by the charter itself, that such notes should be given by others than those who were parties to the act. See the commencement of the 4th article of the charter, where it is provided, that "each appearer or party to this act, *or any other person, may* give," &c. It is not obligatory upon those who *are* corporators, that they *shall* give such notes, and those who *are not* corporators *may* give them, and in this case have given them.

Considering the obligations then as those of sureties, what is their extent as to time and amount?

It appears to me that it would be inconsistent with the express provisions of the 4th article of the charter, to extend the responsibility of the drawers beyond the liabilities of the company incurred within the year during which the notes were respectively *held*. The express language of the article is, "and the said notes shall be held by the company for the term of one year." The concluding sentence provides, "that the makers of the said notes may, however, agree with the directors, that their notes shall remain in possession of the company for a *longer time than one year*, upon the same terms as hereinbefore set forth." In the absence of any such agreement, (and none such is proved,) it would seem that the liability of the parties as to the period of time within which the obligations are to have effect, are fixed in terms by the language of the

McIntosh
v.
Merchants' and
Planters' Ins Co.

4th article. The mere fact that the notes remained in the possession of the company, cannot be construed into such an agreement, as such provision was not accompanied with any stipulation that they should so remain "upon the same terms as before set forth." Moreover, it was the right of the company to retain the notes until the liability of which they were the evidence had been fixed and liquidated. If the liability is not limited to one year, it must be indefinite, and the terms of the charter appear to me to repel the idea that an unlimited responsibility as to time was assumed.

The next question presented for solution is, for whose benefit were these obligations given?

It is urged that the guarantee notes are applicable to the satisfaction of no class of claims except those based upon losses insured against by the company; and this proposition rests upon the construction of the first sentence of the 4th article of the charter—"For the security of those who shall insure previous to the formation of the permanent fund," &c. This whole section is liable to misconstruction, in consequence of the loose manner in which it is expressed, but I think there is force in the argument which refers to the liability of the drawers of the notes to the assessment which is directed to be made, and the payment which is to be demanded, when the "company shall sustain losses greater than its profits will enable it to pay," and it appears to me to be both plausible and reasonable to consider the words "profits" and "losses," as used with reference to their general signification as commercial terms, and the word "security" in the connection in which it is used, as meaning "safety," or "certainty."

It is to be observed, that the whole business of the company was restricted, by its charter, to transactions in the different branches of insurance. The company could not lawfully make any contracts other than those incident to the business of insurance, but it is evident that there might be numerous liabilities growing out of, and necessarily incident to the lawful business of the company, other than its insurance risks, and the question is,'whether the liability of the defendants, as guarantors, is to be restricted to this latter class of obligations, or to be considered as extending generally to all the lawful liabilities of the company. In the absence of proof to the contrary, it is to be presumed that the debts of the company were contracted in the course of their legitimate transactions, and if so, though they may not be contracts of insurance, are they not entitled to the benefit of the security provided by the terms of the 4th section. For instance, a contract may have been made for a supply of lumber to rebuild a house destroyed by fire, and of which the company were insurers, is not the creditor, in such a case, entitled to the benefit of the security?

Upon the other points urged in the arguments at bar, I believe there is no division of opinion in the court, moreover they are fully embraced in the opinion prepared by the Chief Justice, and therefore it is unnecessary to refer to them further than to express my concurrence in the opinions expressed.

1st. That *Pike's* claims, as a seizing creditor, cannot be recognized, for the reason that the obligations seized were not liable in law to be sold for the benefit of a single creditor. The charter provides, that they shall be applicable, either to the satisfaction of the claims of the mass of the lawful creditors of the company, or at least of those who may have become creditors within the

year preceding the maturity of the notes. *Cushing's* claim also comes under this head.

2d. As respects the defence set up by *Dougherty*, I concur in the opinion, that he is not entitled to any credit for premiums paid by him or brought to the company through his influence. This note was not a premium note, but was given, as all the other notes were, as a guarantee note. His verbal understanding with the actuary, admitting it to have been proved, cannot impair the effect of his written obligation, which is of the same tenor and purport with the other guarantee notes. Nor can he be permitted to establish a privilege in his own favor by compensating his claim as an insurer against his liability as a guarantor.

If the views hereinbefore expressed are correct, *Macmurdo's* liability stands on the same footing with that of the drawers of the other notes.

BUCHANAN, J., dissenting. I differ from the majority of the court on the single point, that the makers of guarantee notes are not bound upon contracts made by the company, after one year from the dates of their respective notes. I think, on the contrary, that we must infer an agreement on the part of the makers of those notes, to continue their liability, from the fact of their being found among the papers of the company, when put in liquidation.

VOORHIES, J., dissenting. The charter of the Merchants' and Planters' Insurance Company, incorporated under the provisions of an Act entitled, "an Act to provide for the organization of corporations of this State," approved March 16th, 1848, was declared to be forfeited by a decree of the District Court, dated the 28th of January, 1852. A report, showing the amount and nature of the assets and liabilities of the company, was filed by a receiver appointed for that purpose. This report has given rise to various oppositions, both on the part of the creditors and of the corporators of the company. The fourth article of the charter is in these words:

For the security of those who shall insure previous to the formation of the Permanent Fund, each appearer or party to this act, or any other person, may give his or her promissory note, drawn in favor of the company, and made payable in the following manner: Not less than five, nor more than ten per centum of the amount on the day of commencing business, if required by the Directors, and the balance of the amount at such times, and in such instalments as the Directors may require; but payment of said notes shall not be demanded unless the company shall sustain losses greater than its profits will enable it to pay; and the said notes shall be held by the company for the term of one year, and in case of losses by the company exceeding the profits, and the Directors should require the payment of any part of said notes, prompt payment thereof shall be made; and in default thereof, the makers of said notes shall forfeit and pay the whole balance due, which shall be collected in any court of competent jurisdiction. The makers of said notes may, however, agree with the Directors, that their notes shall remain in possession of the company for a longer time than one year, upon the same terms as hereinbefore set forth.

The notes given under this article of the charter, were classed in the Receiver's report as part of the assets of the company, on which suits were instituted against several of the makers, namely: *John Macmurdo, Denis Cronan, Elliott Robins, John A. Dougherty, Bridge & Brother,* and *Maunsel White & Co.* These suits were cumulated with the *concurso,* or oppositions to the

report, but separate judgments were rendered in several of them, and appeals taken therefrom. On the oppositions, the corporators who were condemned to pay their notes, and the creditors whose claims were rejected, have also appealed from the judgment homologating the receiver's report.

It is contended by *John Macmurdo*, one of the appellants, that the obligation contracted by him was that of suretyship, limited in its terms under the charter to twelve months; that the Directors of the company having failed to make any assessment, or to call on him for losses, or to make any arrangement with him to keep his note, within that period, his obligation ceased and was at an end. This proposition is certainly untenable. From the fact that nearly all the notes bear different dates, it is unreasonable to infer that it ever entered into the contemplation of the parties, that their liability should be limited to the losses occurring within the term stipulated for the payment of their respective notes, particularly when it is considered that some of their notes were given long after the act of incorporation had been signed by them. The terms of the charter repel such a construction, which, if conceded, would necessarily lead to a variety of assessments, more or less intricate, especially if made in reference to the adjustment of the incidental expenses of the company, which obviously constituted a part of the losses intended to be secured by these assets. Hence, under this construction of the contract of the parties, made in reference to the charter, the difference in relation to the dates of their respective notes, must be considered as immaterial.

It is clear, from the terms of the charter, that the notes thus given constituted the assets, the capital of the company "for the security of those who should insure previous to the formation of the Permanent Fund." Now, it may be asked, how could this capital be withdrawn as such security, previous to the happening of that contingency—"the formation of the Permanent Fund?" As no Permanent Fund was ever formed, the negative of this question would seem to be repugnant to the palpable meaning of words. The position that the obligation must be viewed in the light of suretyship contracted for the benefit of the company, is equally untenable, either on principles of law or of equity. The hope of gain, as in all aleatory contracts, formed the consideration of the notes given by the corporation, the extinguishment of which depended on the formation of the Permanent Fund as provided for by the 5th Article of the charter, in these words:

There shall be set apart, as soon as the business and profits of the corporation will allow it, a Permanent Fund, of the amount of $200,000; and for the formation of said fund, all the profits arising from Insurance or any other source, during the first year, except so much as may be required for paying the subscribers, as hereinbefore mentioned, and expenses, shall be set apart for that purpose, &c.

The clause in this Article, that the profits of the first year, after certain deductions, should be set apart for the permanent fund, was evidently based on the hope that the corporators expected to realize such profits, but were disappointed. This does not shake in the least, my construction of the contract, which is, besides, fortified by another article of the charter in these words: "All persons who shall have paid their notes, or any part thereof, shall be entitled to reimbursement of such amount, with six per cent. per annum interest."

In relation to the other notes, the same question arises. It is however urged

411

by *Dougherty*, that the note given by him, is entirely different from the others
which were given under the 4th Article of the charter; that it was given merely as an earnest that he would bring business to the office equal to its amount—
$4,000. Having signed the charter, he must be treated as one of the corpora-
tors. His note cannot be distinguised from the others, except as to its date.
As we have already seen, this must be considered as immaterial and not alter-
ing the nature of his liability. Under the 4th Article of the charter it is ex-
pressly provided, that "for the security of those who shall insure previous to
the formation of the permanent fund, each appearer or party to this act, or
any other person, may give his or her promissory note, drawn in favor of the
company," &c. Under this stipulation, as one of the corporators, it is clear
that he cannot escape from his liability. The decisions on which he relies to
sustain the grounds of his defence, were based upon premium notes of Mutual
Insurance Companies, whose charters were essentially different in many re-
spects from the one under consideration, and therefore cannot aid us in our
examination.

The question arising out of the oppositions of the creditors who are appel-
lants, are next to be considered.

*J. W. Pike*, as a judgment creditor, claims a privilege on the assets of the
company, by virtue of a seizure made under an execution of his judgment.

The liabilities which the company had authority to contract, were expressly
prescribed by the 17th Article of the charter, in these words :

The Board of Directors shall have full power to do all acts necessary to
carry into effect the purposes of the corporation, which are declared to be, to
make insurance upon ships and all other vessels, steamboats, and all other river
or lake craft, upon freight, seamen's wages, goods, wares, merchandize, gold
and silver, bullion or money, against all maritime risks, risks of rivers or lakes,
or such as are usually insured against. Also upon houses, stores and build-
ings, every kind whatsoever, and on goods, wares, merchandize, furniture, and
other articles, against fire. Also, upon bottomry and respondentia, and upon
the lives of all persons, free or slaves, and granting annuities, &c.

As already stated, incidental expenses necessary to carry on the business of
the company, must also be included among its legal liabilities. Its assets con-
stituted the common pledge of its creditors. Privileges secured by the charter
cannot therefore be affected by the seizure of any one of its creditors so as to
prejudice the rights of the others. Conceding the correctness of *Pike's* judg-
ment, his seizure clearly gave him no privilege to be paid out of the common
pledge in preference to the other creditors.

In relation to the claim of *A. W. Scates*, as collector of State taxes, I think his
opposition was properly overruled by the District Court. The assets of the com-
pany, consisting only of the notes of its corporators, cannot be fairly considered
as coming under the operations of the statute. Its profits alone could have
constituted such capital, and its insolvency shows that none were ever realized.
It is urged by the opponent, that the State is entitled to a privilege for its claim.
The counsel has not favored the court with any authority on the subject, and
I am not aware of any law granting such privilege. I think, however, the
claim as allowed, should be paid concurrently with those classed on the tableau
to be paid for losses out of the proceeds of the guarantee notes.

In the opposition of *L. Cushing*, the record shows that he is the owner of an
adjusted claim in favor of *B. Coffins*, for the sum of $1,030, on a policy of
insurance of the company for losses, which he acquired at Sheriff's sale, under
53

McINTOSH
v.
MERCHANTS' AND
PLANTERS'INS. Co.

an execution issued on a judgment in his favor against said *Coffins*, in which said company was garnisheed. This claim should also be entitled to be paid concurrently with the other claims, out of the proceeds of the guarantee notes, but not with privilege, as claimed by virtue of his seizure, for the reasons assigned in the opposition of *Pike*.

I am, therefore of opinion, that the judgments rendered by the District Court in favor of the Receiver against *Denis Cronan, Bridge & Brother* and *John Dougherty*, should be affirmed with costs in both courts; and that the tableau should be amended by placing thereon the claims of *Cushing* and *Scates*, to be paid concurrently with the other creditors, out of the proceeds of the guarantee notes, and so amended that the judgment of the District Court homologating said tableau should be affirmed with costs.